Wilfred P. Coronato
E-mail: wilfred.coronato@hugheshubbard.com
HUGHES HUBBARD & REED LLP
A New York Limited Liability Partnership
101 Hudson Street, Suite 3601
Jersey City, New Jersey 07302-3910
Ph: (201) 946-5700
Fax: (212) 299-6000
*Attorneys for RD Legal Capital, LLC*
*and Roni Dersovitz*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RD LEGAL CAPITAL, LLC, and RONI DERSOVITZ, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br> Defendant. | Civil Action No. _____ <br><br> Hon. _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

RD Legal Capital, LLC ("RDLC"), with its principal place of business at 45 Legion Drive, Cresskill, NJ 07626, and Roni Dersovitz, with an address of 65 Legion Drive, Cresskill, NJ 07626, (jointly "Plaintiffs"), for their complaint against the United States Securities and Exchange Commission ("SEC" or the "Commission"), with an address of 100 F Street, NE, Washington, D.C. 20549 respectfully allege as follows:

1

## PRELIMINARY STATEMENT

1.      On July 14, 2016, the SEC issued an Order Instituting
Administrative and Cease-and-Desist Proceedings (the "OIP") compelling
Plaintiffs to participate in an unconstitutional proceeding in an internal SEC
administrative forum.  Based on supposed misstatements cherry-picked from
marketing materials and presentations, the OIP alleges that Plaintiffs violated
certain provisions of the federal securities laws and seeks remedies including
disgorgement and civil monetary penalties

2.      Neither Mr. Dersovitz, the manager of two small hedge funds, nor
his advisory firm, RDLC, provide investment advice concerning securities, and
neither is registered with the Commission.[1]  Accordingly, before the enactment
of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010
("Dodd-Frank"), the SEC would have been required to pursue this action
seeking monetary penalties against Plaintiffs in a federal court.  Now, however,
the SEC purportedly has the option of forcing Mr. Dersovitz to defend his
reputation and livelihood in a proceeding where the prosecutor, fact finder,

---

[1] Under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*, only
those advisers who provide investment advice concerning securities can be
registered with the Commission.  RDLC provides investment advice to two
small hedge funds.  The assets for which RDLC provides its investment advice
are not securities.  RDLC is therefore not registered with (and cannot be
registered with) the Commission.

judge, and initial appeals tribunal all function within the same bureaucratic agency and operate largely outside the purview of the judiciary.

3.      The case against Mr. Dersovitz and RDLC is interesting for what it does not contain.  The SEC does not allege (nor could it) that any investor in the underlying funds lost money on their investments.  To the contrary, in a difficult investing environment, Mr. Dersovitz and RDLC achieved for their investors the nearly impossible:  double-digit compounded annual returns for each investor over the life of their investment.  The SEC also largely does not allege that Mr. Dersovitz and RDLC acted outside the scope of their authority under the offering documents for the funds.  To the contrary, Plaintiffs delivered strong returns to their investors by employing the same investment strategy that was expressly described in the offering documents as well as in marketing materials and oral presentations.

4..      Instead, the SEC's case against Plaintiffs is based largely on allegations that they somehow misrepresented to investors in marketing meetings and phone calls the nature of the investment in the funds and the content of assets in the portfolio.  The SEC claims that many of these alleged

misrepresentations were oral, were made to numerous unidentified investors,[2] and occurred over a five-year period.  Thus, the case the SEC is pursuing against Plaintiffs is *intensely* fact driven, making it particularly *ill-suited* for an administrative forum where Plaintiffs are denied the basic rights of discovery allowed under the Federal Rules of Civil Procedure and must prepare to defend themselves on a hyper-accelerated basis.

5.    Yet, perhaps realizing its case would not withstand scrutiny under the fundamental procedural and constitutional safeguards found in the federal courts, the SEC chose to bring its action on its "home court" as an administrative proceeding.  Plaintiffs are thus forced to litigate with one arm tied behind their backs in a forum that could not have heard this case in its present form before the passage of Dodd-Frank.  The United States Constitution, however, protects citizens like Mr. Dersovitz from such deprivations of liberty and fundamental due process.

---

[2]  The Rules of Practice applicable to SEC administrative proceedings do not require that the Commission plead its allegations with particularity, even when charging fraud as here.  The OIP in this matter is replete with references to alleged statements made to unnamed investors without sufficient information provided to identify the investor in question, the date or even year the statement was made, the means in which the statement was communicated (email, phone, etc.), or even the substance of the statement itself.  Such a complaint would not meet the standards of Rule 9 of the Federal Rules of Civil Procedure.

6.     SEC administrative enforcement proceedings against unregulated parties, like the proceedings against RDLC and Mr. Dersovitz, are unconstitutional for several reasons.

7.     *First*, SEC administrative enforcement proceedings violate Article II of the United States Constitution, which states that the "executive Power shall be vested in a President of the United States of America" and that "the Congress may by law vest the Appointment of such inferior Officers, as they think proper, . . . in the Heads of Departments."  U.S. Const., art. II, § 1, cl. 1; *id.* § 2, cl. 2.  The Appointments Clause is a "significant structural safeguard" of the Constitution and requires every "officer" of the United States "to be appointed in a specific manner, as prescribed in Article II, section 2, clause 2." *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 821 F.3d 19, 36 (D.C. Cir. 2016).

8.     The United States Supreme Court has held that the Commission is a "Department" of the United States, and that the SEC Commissioners (the "Commissioners") collectively function as the "Head" of the Department with authority to appoint such "officers" as Congress authorizes.  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) ("*Free Enterprise*").  SEC Administrative Law Judges ("ALJs") preside over  SEC administrative proceedings.  They are executive branch "officers" within the

meaning of Article II who must be appointed in accordance with the Appointments Clause. This fact is established through federal statutes, SEC rules and regulations, and the practical takeaways of the decisions ALJs make.

9. Moreover, the Commission has admitted in recent federal court proceedings that SEC ALJs—including the same ALJ presiding over Plaintiffs' administrative proceeding—have not been appointed by the SEC Commissioners as required by the Constitution and statutory law.

10. *Second*, the two-layers of tenure protection that insulate SEC ALJs from democratic accountability also violate Article II of the Constitution. This violation exists because the insulation provided to SEC ALJs prevents the President from "tak[ing] Care that the Laws be faithfully executed." U.S. Const. art. II § 1, cl. 1; *id.* § 3. Indeed, the Supreme Court has held that officers—like SEC ALJs—charged with executing federal law may not be separated from Presidential supervision and removal by more than one layer of tenure protection. In particular, if an officer can be removed from office only for good cause, then discretion to remove that officer cannot be vested in another official who also has good-cause tenure. *Free Enterprise*, 561 U.S. at 492-98.

11.     SEC ALJs, however, enjoy at least two—and likely more—layers of tenure protection.  The SEC administrative proceedings therefore violate Article II and are unconstitutional.

12.     *Third*, SEC administrative enforcement proceedings also violate the Due Process Clause of the Fifth Amendment to the United States Constitution, which states that "[n]o person  . . . shall be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "Due process of law requires that the proceedings shall be fair . . . ."  *Snyder v. Commonwealth of Mass.*, 291 U.S. 97, 116 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964).

13.     As noted, the OIP commencing the administrative proceeding against Plaintiffs alleges violations of federal securities laws and seeks disgorgement, civil penalties, and a cease-and-desist order.  Given the severe consequences that could result from an adverse determination, due process demands certain protections to ensure the fairness of the proceedings.  The expedited administrative proceeding, however, lacks those basic safeguards:  it will occur before an unconstitutionally appointed SEC ALJ, without a jury, without the protections of the Federal Rules of Evidence and Federal Rules of Civil Procedure, and in the SEC's own forum where trial by hearsay through

investigative depositions and declarations is authorized.  On its face, this

"process" violates Plaintiffs' due process rights.

14.     Declaratory and injunctive relief are thus necessary to prevent

RDLC and Mr. Dersovitz from being compelled to submit to an

unconstitutional proceeding and from suffering irreparable reputational and

financial harm, all without meaningful judicial review.

## JURISDICTION, VENUE, AND PARTIES

15.     This court has subject matter jurisdiction over this action pursuant

to 28 U.S.C. §§ 1331, 1337, 1346, 1651, 2201 and 5 U.S.C. §§ 702 and 706.

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e).

16.     Plaintiff RDLC is a Delaware limited liability company with its

principal place of business in Cresskill, New Jersey.  RDLC is the managing

partner and investment manager of the investment funds RD Legal Funding

Partners, LP and RD Legal Funding Offshore Fund, Ltd.

17.     Plaintiff Roni Dersovitz is a citizen of New Jersey.  He is the

president and chief executive officer of RDLC.

18.     The SEC is an agency of the United States government,

headquartered in Washington, D.C.

19.     It is appropriate and necessary for this Court to exercise

jurisdiction over Plaintiffs' claims because:  (a) without judicial review at this

stage, meaningful judicial review will be foreclosed; (b) Plaintiffs' claims are

wholly collateral to the review provisions of the federal securities laws; and

(c) Plaintiffs' claims are not within the particular expertise of the SEC.

Moreover, it would be futile and unfair for Plaintiffs to have to devote the

considerable time and resources necessary to pursue their claims before the

SEC given that the SEC ALJ assigned to the case has already rejected similar

constitutional challenges, and, in a split decision, the Commission itself has

rejected similar constitutional challenges (with two of five Commissioners

expressing the view that the federal courts should decide the constitutional

challenges).  Plaintiffs—and others in their position—should be provided a

judicial determination regarding their constitutional rights without being forced

to spend an exorbitant amount of time and money litigating in the very forum

they contend is unconstitutional.  Such expenditures are not part and parcel of

litigating through the judicial system, but rather are extraordinary and

unnecessary costs.

## **BACKGROUND**

### *RD Legal Funding*

20.    Mr. Dersovitz practiced law in New York for 14 years.  During

that time, he witnessed the challenges many attorneys and law firms face in

managing cash flow.  These challenges were often most acute for personal

injury lawyers with contingency fee-based caseloads.  In many of these cases, several years might pass from the time the attorneys were engaged until the payment of their legal fees.  This extended timeline creates an unusually long working capital cycle, even for law firms with a strong portfolio of cases.

21.     The challenge of managing cash flow at these law firms is compounded by the fact that the most valuable assets those firms often hold— their right to future legal fees from the settlement agreements and judgments they have secured for their clients—are not recognized as collateral by banks. Traditional forms of financing thus provide limited options for attorneys in this space.

22.     Understanding this need, in 1996 Mr. Dersovitz began using his personal assets to factor law firm receivables and provide a source of funding and liquidity for contingency fee-based law firms, and quickly discovered a significant demand for this type of financing.  Accordingly, in 1998, Mr. Dersovitz formed RD Legal Funding, LLC ("RDLF"), a New Jersey limited liability company, to identify, originate, and purchase legal receivables.  RDLF grew quickly, and by 2001 Mr. Dersovitz dissolved his law practice and focused on legal financing full-time.

23.     Since its formation, RDLF has funded and successfully collected more than $200 million in legal receivables spread over more than 1,500 separate asset positions originated from attorneys and plaintiffs.

### The Investor Funds

24.     With the growth and success of RDLF, Mr. Dersovitz decided to create two private funds to raise capital necessary to take better advantage of the deep capacity in this area.  In September 2007, Mr. Dersovitz launched RD Legal Funding Partners, LP, a Delaware limited partnership (the "Domestic Fund"), and RD Legal Funding Offshore Fund, Ltd., a Cayman Islands exempted company (the "Offshore Fund").  Both the Domestic Fund and the Offshore Fund (collectively, the "Funds") follow the same investment strategy. As described in the Funds' offering documents, the Funds seek to generate stable returns for investors, while maintaining capital, through:  (a) purchasing from law firms their receivables representing legal fees owed; (b) purchasing from plaintiffs receivables representing their proceeds from legal awards or settlements; (c) providing loans to law firms through secured lines of credit; and (d) providing capital to law firms to pursue certain other opportunities that do not fall within the categories above.  The Funds currently have approximately $248 million in assets under management.

25.     The structure of the Funds differs from most traditional hedge funds in a way that ensures the interests of the Funds' investors and managers are more closely aligned.  There is no management fee.  There is no performance fee.  The Funds do not follow any version of a "2 and 20" model. Instead, the manager of the Funds receives nothing unless and until all investors in the Funds are allocated their compounded annual return of 13.5%.

26.     The success of the Funds has been (and continues to be) nothing shy of extraordinary.  Since launching in 2007, each investor in the Funds has received a cumulative return of over 13% per annum over the life of their investment.[3]  Even during the financial crisis, when the capital markets saw historic downturns and many alternative investment funds suffered significant investor losses, none of the investors in the Funds lost any money, and most realized the full targeted 13.5% compounded annual return.

### RD Legal Capital

27.     Plaintiff RDLC serves as the General Partner of the Domestic Fund and the Investment Manager of the Offshore Fund.  As noted, RDLC does not receive a management fee from the Funds.

---

[3] From the formation of the fund in 2007 through 2015, all investors in the Domestic Fund earned their full targeted 13.5% return per annum.  For the Offshore Fund, all investors earned their full targeted 13.5% return per annum from the formation of the fund in 2007 through 2014.  In 2015, the Offshore Fund earned a return of 11.4% for investors.

28.     At the end of each month, the net profits and losses of the Funds, including realized and unrealized gains and losses, are allocated to the accounts of the Limited Partners of the Domestic Fund and to the Shareholders of the Offshore Fund.  The target return for Limited Partners/Shareholders is an amount which equals 13.5% per annum of the average capital account balance for each investor.  Any net profits in excess of the Limited Partner/Shareholder return are allocated to the capital account of the General Partner/Investment Manager (*i.e.*, to the capital account of RDLC).  This excess return is the only income or fee of any kind RDLC receives from the Funds, and all expenses incurred in operating the Funds must be paid out of this excess return.

29.     The return to investors in the Funds is cumulative.  Thus, if an investor fails to receive their full Limited Partner/Shareholder return in any given month, the entire amount of that shortfall is reserved, and all future net profits are allocated to the capital accounts of those investors.  Until all such cumulative shortfalls are satisfied, the General Partner/Investment Manager receives nothing.

30.     As General Partner and Investment Manager to the Funds, RDLC is responsible for the general expenses of operating the Funds.  These include employee payroll and payroll taxes, consultant fees, legal fees, rent, travel,

health insurance, information technology, marketing and advertising, depreciation, interest, lien search fees, accounting, utilities, and bank charges.

### The Peterson Cases

31.     Since forming the Funds in 2007, Mr. Dersovitz has employed an opportunistic strategy, deploying capital to capture strong returns for investors when unique events and opportunities present themselves.  One such opportunity concerned providing financing to the attorneys and plaintiffs who had secured non-appealable judgments against the government of the Islamic Republic of Iran related to the 1983 bombing of a Marine barracks in Beirut, Lebanon.  Mr. Dersovitz, who spoke frequently with investors about the *Peterson* cases, has always maintained that the assets acquired from these financings were the "best trade in the book," as solid as any in the Funds' portfolio.  Time has shown him to be correct.

32.     On October 23, 1983, a terrorist group sponsored by the government of the Islamic Republic of Iran attacked a U.S. Marine barracks in Beirut, Lebanon, killing and injuring more than 350 American servicemen and women.  Victims of the bombing and their families filed multiple civil actions against Iran in the United States District Court for the District of Columbia, including *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003) (*Peterson I*).  The plaintiffs established jurisdiction under the Foreign

14

Sovereign Immunities Act, which allows legal actions where "money damages are sought against a foreign state for personal injury or death that was caused by an act of . . . extrajudicial killing." 28 U.S.C. § 1605A(a)(1). The District Court entered a default judgment against Iran and awarded the *Peterson* plaintiffs approximately $2.65 billion in compensatory damages. *Peterson I*, 264 F. Supp. 2d at 60-65.

33.    In 2008, attorneys for the plaintiffs in *Peterson* learned that more than $2 billion in bonds owned by the Central Bank of Iran ("Bank Markazi") were being held illegally in a Citibank account in the United States. In July 2008, the plaintiffs registered their judgments in the United States District Court for the Southern District of New York and sought to restrain the transfer of the bond assets held for Bank Markazi in Citibank. *See Peterson v. Islamic Republic of Iran,* No. 10 Civ. 4518 (KBF), 2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013) (*Peterson II*).

34.    In June 2010, the plaintiffs initiated an action in the Southern District of New York seeking turnover of the restrained assets under Section 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA"), which provides that "in every case in which a person has obtained a judgment against a terrorist party . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to

execution or attachment." TRIA, Pub. L. No. 107-297, § 201(a), 116 Stat. 2322 (2002) (codified as amended at 28 U.S.C. § 1610(f)).

36.     The court consolidated the July 2008 and June 2010 actions. Then, on February 5, 2012, while the consolidated action in the Southern District of New York was pending, President Obama signed Executive Order 13,599, which blocked the assets at issue in the litigation. Exec. Order No. 13,599, 77 Fed. Reg. 6659, 6659 (Feb. 5, 2012). Following President Obama's Executive Order, the *Peterson* plaintiffs moved for partial summary judgment under TRIA.

36.     In August 2012, while the motion for summary judgment was still pending, Congress took the extraordinary step of including a provision in the Iran Threat Reduction and Syria Human Rights Act of 2012 that sought to accelerate the payments due to the *Peterson* plaintiffs. That provision, codified at 22 U.S.C. § 8772, states that "the financial assets that are identified in and the subject of proceedings in . . . *Peterson et al. v. Islamic Republic of Iran et al.*, . . . shall be subject to execution . . . in order to satisfy any judgment to the extent of any compensatory damages awarded against Iran for damages for personal injury or death caused by an act of [terrorism]." Pub. L. No. 112-158, § 502, 126 Stat. 1214, 1258 (codified at 22 U.S.C. § 872(b) and (a)). The *Peterson* plaintiffs subsequently filed a supplemental motion for summary

16

judgment, raising this additional and independent basis for granting the relief requested.

37.     Realizing the incredible opportunity provided by the *Peterson* cases—where a large number of plaintiffs had obtained non-appealable default judgments for billions of dollars, a corpus of money available to satisfy those judgments had been forfeited and was under the control of the United States, *and* Congress and the President both specifically directed that those funds go to the plaintiffs—Mr. Dersovitz began extending financing to both attorneys and plaintiffs in the litigation.

38.     In March 2013, Judge Katherine Forrest granted summary judgment to the *Peterson* plaintiffs and ordered the turnover of the assets in Citibank. *See Peterson II*,  2013 WL 1155576 at *28-34.  On appeal, the Second Circuit unanimously affirmed the District Court's order.  *Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 188 (2d Cir. 2014).[4]

39.     On December 29, 2014, Bank Markazi petitioned the Supreme Court for a *writ of certiorari*.  On April 6, 2015, the Supreme Court invited the Solicitor General to file a brief expressing the views of the United States regarding the *certiorari* petition.  The Solicitor General argued strongly against

---

[4] The Second Circuit limited its holding to § 8772, finding that that provision alone was dispositive.  A request for rehearing *en banc* was denied.

granting *certiorari*, saying "the court of appeals correctly held that Section 8772 permissibly altered the law applicable to this case by changing the standards governing execution against the assets at issue and leaving application of those standards for judicial determination."  Brief for the United States as Amicus Curiae at *11, *Bank Markazi v. Peterson*, __ U.S.__, 136 S. Ct. 1310 (2016) (No. 14-770), 2015 WL 4940828, at *11.

40.    On October 1, 2015, however, the Court granted *certiorari* to Bank Markazi.  This was an unexpected event for the Funds and for investors.  While the *certiorari* order did not impact whether the *Peterson* assets would ultimately collect (there were independent grounds for relief under TRIA and other collateral sources for payment), and did not significantly impact the valuation of the Funds' assets (since the *Peterson* positions continued to accrue interest during the delay caused by the Supreme Court litigation), it did impact the liquidity in the Funds for a period of time.

41.    The Court heard argument in *Peterson* on January 13, 2016.  On April 20, 2016, the Court affirmed the decision of the Second Circuit by a vote of six to two.  *Bank Markazi v. Peterson*, 136 S.Ct. 1310, 1317 (2016).  On June 6, 2016, following the affirmance in *Peterson*, Judge Forrest issued an order authorizing the release of funds from the Qualified Settlement Trust.  *See Peterson II*, No. 10 Civ. 4518, Order dated June 6, 2016.

18

42.     The monies now held in a Qualified Settlement Trust for the benefit of the *Peterson* plaintiffs will soon be released.  In the interim, *Peterson*-related collections have already poured into the Funds.  In May 2016, *nearly $37 million dollars* was collected and distributed to redeeming and participating investors under the terms of the governing documents.  The Funds anticipate the possibility of distributing additional interim collections before the full release of monies from the Qualified Settlement Trust.

43.     Thus, as Mr. Dersovitz has always believed and stated, and consistent with the legal analysis he received from various outside counsel analyzing the legal merits of the *Peterson* cases, the assets originated from the *Peterson* cases proved to be as strong and secure as any in the Funds' portfolio.

## THE SEC INVESTIGATION

44.   The Commission long has acknowledged that "[t]he power to investigate carries with it the power to defame and destroy."  17 C.F.R. § 200.66.

45.   In March 2015, the Division of Enforcement of the SEC (the "Division") began an investigation into whether RDLC and Mr. Dersovitz violated the anti-fraud provisions of the Securities Act of 1933 and the Exchange Act of 1934.  RDLC and Mr. Dersovitz cooperated fully with the Division's investigation, producing information voluntarily during a

comprehensive and long *ex parte* investigation.  In all, Plaintiffs produced

approximately one million pages of documents to the Division.

46.     The investigation focused largely on the investments relating to the

*Peterson* cases.  Mr. Dersovitz has explained consistently and in detail that he

operated within the parameters of the Funds' operating documents, always

disclosed the investments in *Peterson*—the "best trade in the book"—and had

the discretion and flexibility to invest heavily in such a strong trade.  Moreover,

no investor lost any money invested in the Funds.  To the contrary, the Funds'

sophisticated, accredited investors are all profiting handsomely from Mr.

Dersovitz's decision to invest in *Peterson*-related assets.

47.     The Division's investigation stretched on for fourteen months,

during which time the Division:

- Took *ex parte* testimony from five company employees that, in some cases, lasted multiple days;

- Took *ex parte* testimony from many third-parties, including the Funds' valuation firm;

- Received at least an additional one million pages of documents in response to third-party subpoenas;

- Invested a large amount of Division resources into the investigation  with three SEC staff attorneys consistently working on the matter, and up to five SEC staff members attending testimony, including an Assistant Director of the Division who asked questions on the record; and

- Contacted and interviewed dozens of investors.

20

48.   Ultimately, the Commission's OIP alleges that RDLC and Mr. Dersovitz violated the federal securities laws by misrepresenting or omitting to investors (1) the Funds' investments in receivables from judgments (like the one in *Peterson*), as well as from settlements, (2) the Funds' concentration in receivables relating to *Peterson*, and (3) the value of the *Peterson* receivables. The trial of the matter will be highly fact intensive and require credibility determinations and does not turn on technical regulatory issues within the SEC's expertise.

49.   Furthermore, the OIP's fraud allegations could not pass muster under Rule 9(b) of the Federal Rules of Civil Procedure.  To the extent specific representations are set forth in the OIP, they are cherry-picked statements taken out of context and are more misleading to a reviewing body than anything Mr. Dersovitz is accused of doing to his investors.

50.   For example:

a.   **Marketing Materials:** the OIP quotes from the Funds' "Frequently Asked Questions" handout, which stated that "[t]he primary strategy employed is one in which receivables arising from settled lawsuits are purchased at a discount," and alleges that the representation was fraudulent. But this statement in fact accurately reflects the Funds' strategy.  Investing in receivables from settled lawsuits *is* the primary strategy of the Funds, and

whether those lawsuits are resolved and "settled" by the parties or by the court (in the form of a non-appealable judgment) makes no difference to investors.

Moreover, the very next passage in that FAQ handout, *in the very same paragraph*, states, "The primary focus is on purchasing the aforementioned receivables of settled cases, or **non-appealable judgments**" (emphasis added). This is an extraordinary omission on the part of the SEC.

b. **Marketing Presentations:** the OIP refers to a transcript of a telephone call with a potential investor where Mr. Dersovitz stated: "What we're dealing with *primarily*, 100 percent, are settled cases. So there is no litigation risk in this strategy." (Emphasis added.) The OIP does not disclose that moments later, in the same telephone call, Mr. Dersovitz explained: "Now we accelerate legal fees on settlements **and judgments** that are collectable." (Emphasis added.) More egregiously, the OIP does not disclose that in the same presentation, Mr. Dersovitz provided an extensive discussion of *Peterson* itself, which he said arose from "a **judgment** [] obtained in 2007 or so." (Emphasis added.) Mr. Dersovitz went on to say:

> With that, we began to consider making advances to the attorneys – to the plaintiffs who had award line items in **judgment** – the $2.65 billion **judgment** that they had received in 2007. There was discussion at that point in time that a further Iranian sanctions bill would come to pass later this year that would specifically address this litigation and mandate that the seized funds be used to pay these **judgment** holders.

* * *

22

> The Iranian sanctions bill of 2012 passed and was signed by President Obama has a provision in it, Section 502, that specifically address the litigation and specifically says that the money that is the subject matter of this litigation be distributed to those **judgment** holders.

*Id.* at 38-39 (emphasis added).  Contrary to the allegations in the OIP, no honest reading of this transcript can lead to a conclusion that Mr. Dersovitz somehow concealed that the Funds were invested in judgments, generally, and the *Peterson* cases, specifically.

          c.    **Offering Documents:**  the OIP quotes a 2011 version of the Funds' offering documents as stating that the Funds only invest in settlements, and ignores that the very first page of the Offering Memorandum, under the heading "Investment Objective and Strategy," states:

> "The Partnership will (i) purchase from law firms and attorneys (collectively, the "Law Firms") certain of their accounts receivable representing legal fees derived by the Law Firms ***from litigation, judgments and settlements*** ("Legal Fee Receivables"), and (ii) provide loans to such Law Firms through secured line of credit facilities ("Lines of Credit")." (emphases added).

The OIP also incorrectly states that the offering documents did not mention judgments and other investments until 2013, when in fact the 2013 Offering Memorandum retained verbatim the language on judgments and lines of credit from the 2011 Offering Memorandum, while adding additional investment strategies.

23

d.     **Public Disclosures:** the OIP also ignores that public disclosures to investors available on the SEC's own website disclosed that the "Investment Objectives and Strategy" include (1) the "purchase from law firms and attorneys certain of their accounts receivable representing legal fees from litigation, judgments and settlements," (2) "loans to such law firms and attorneys through secured line of credit facilities," and (3) "provid[ing] other capital to law firms or directly to plaintiffs not contemplated by the activities set forth above."

e.     **Other Available Documents:**  the OIP also simply ignores the high degree of transparency in the Funds, which, among other things, disclosed to investors in detail the Funds' concentrations through annual audited financial statements.

f.     **Valuations:**  Perhaps most egregiously, the OIP's allegations that the *Peterson* assets were overvalued are completely belied by the fact that the valuations have proved to be accurate (if not too low), and the Funds' investors are in the process of receiving more than $100 million in *Peterson*-related payouts.

51.   But the SEC's overzealous investigation does not stop with the cherry-picked allegations set forth in the OIP.  At least one investor has come forth to say that the SEC "put considerable pressure" on him to make a

24

statement.  He then provided a declaration to the SEC that would undoubtedly be excluded as hearsay in federal court, but which may be used by the SEC in the administrative proceeding pending against Plaintiffs.  *See* RoP 235(a). Another witness has similarly complained to Plaintiffs about being pressured by the SEC to cooperate.  Accordingly, as set up and currently operating, the SEC's unconstitutional, bureaucratic forum handicaps Plaintiffs and other respondents to the benefit of the SEC without providing meaningful mechanisms to ensure fair proceedings.

## THE SEC's CHOSEN FORUM

52.   The securities laws provide the SEC with the discretion—guided by no statute, regulation, or established practice—to bring an enforcement action either in the United States District Court or in internal SEC administrative proceedings.

53.   Before an oversight committee of Congress on March 19, 2015, the SEC Director of Enforcement testified that over the last fiscal year the Division tried a majority (57%) of its cases in District Court, with the rest before ALJs.  But the question remains why the SEC decided to send a minority of contested proceedings to ALJs.  Pressed to explain the standards for choosing a forum, the Director's responses were largely rhetorical.  "We use the forum that we think is appropriate for the goals of investor protection,"

25

he testified, later adding, "I have not heard criticism from investors about the administrative law judges' procedure." Of course there has not been investor criticism. Investors are not respondents in those proceedings, they do not have their careers at stake in connection with such proceedings, and they have access to the federal courts to pursue securities law claims as plaintiffs.

54.    One SEC Commissioner has remarked on the perceived unfairness of the administrative process: "To avoid the perception that the Commission is taking its tougher cases to its in-house judges, and to ensure that all are treated fairly and equally, the Commission should set out and implement guidelines for determining which cases are brought in administrative proceedings and which in federal courts." Commissioner Michael S. Piwowar, *A Fair, Orderly and Efficient SEC*, Remarks at "SEC Speaks" Conference, Feb. 20, 2015.

### *Administrative Proceedings*

55.    An administrative proceeding is an internal SEC hearing, litigated by SEC trial attorneys and governed by the SEC's Rules of Practice ("Rules of Practice" or "RoP"),[5] in which an SEC ALJ serves as finder of fact and of law.

---

[5] The Rules of Practice are in the process of being amended. The new rules were made public on July 13, 2016 (the day before the underlying administrative proceeding was filed). Thus, current SEC administrative proceedings may be governed by the old rules or the new rules, depending on the timing of the proceedings and the consent of the parties.

56.     Administrative proceedings differ in several critical ways from federal actions that make administrative proceedings more advantageous to the SEC.  Those differences include:

a.     In administrative proceedings, a respondent is not entitled to a jury, and the SEC ALJ serves as finder of both fact and law.

b.     The Federal Rules of Civil Procedure do not apply in an administrative proceeding.

c.     The Federal Rules of Evidence, together with their associated protections, do not apply in administrative proceedings.

d.     The new SEC Rules of Practice for administrative proceedings expressly allow trial by hearsay, including by the use of *ex parte* investigative testimony and declarations, which deprive respondents of any ability to cross-exam witnesses and meaningfully challenge the SEC's evidentiary support for its action.

e.     The new SEC Rules of Practice for administrative proceedings require respondents to disclose theories, other than affirmative defenses, in their answers or risk waiving substantive rights.

f.     Respondents' ability to conduct discovery is significantly limited in administrative proceedings.  While the SEC has broad and

nearly unfettered discovery rights during the investigative phase of

a proceeding—which can last years—respondents have limited

discovery rights and are subject to an expedited schedule.

g.      The SEC Rules of Practice do not allow respondents to assert

counterclaims against the SEC.  Federal court defendants may

assert counterclaims against their adversaries.

57.     Some observers have found that the SEC has succeeded much

more often in administrative proceedings, where it enjoys the procedural

advantages described above, than in federal actions.  Gretchen Morgenson, *At

the S.E.C., a Question of Home-Court Edge*, N.Y. TIMES, Oct. 5, 2013.  In

fact, one study conducted in 2015 found that the SEC had won the last 219

decisions before its ALJs—a "winning streak, which began in October 2013"—

at a time when it had lost several high-profile decisions in federal courts.  Jenna

Greene, *The SEC's on a Long Winning Streak*, National Law Journal, Jan. 19,

2015.

58.     In contrast, when forced to bring cases before unbiased,

constitutionally compliant United States District Court judges, on a level

playing field, where defendants are protected by juries, broad discovery rights,

robust rules of evidence, and other procedural safeguards, the SEC's win-loss

record has been less strong. Some federal judges have been openly critical of

28

the SEC in the cases it selects to bring and how it brings them.  One District Court judge noted that the courts have "functioned very effectively for decades," adding that he saw "no good reason to displace that constitutional alternative with administrative fiat."  Nate Raymond, *U.S. Judge Criticizes SEC Use of In-house Court for Fraud Cases*, Reuters, Nov. 5, 2014.  Indeed, at least one SEC Commissioner, a former SEC ALJ, and a United States District Court judge are reported to have raised fairness concerns about the proliferation of SEC administrative enforcement actions.  *See, e.g.*, Jean Eaglesham, *SEC Wins With In-House Judges*, The Wall Street Journal, May 6, 2015; Commissioner Michael S. Piwowar, *A Fair, Orderly and Efficient SEC*, Remarks at "SEC Speaks" Conference, Feb. 20, 2015.

59.     Moreover, any appeal from the SEC ALJ's decision goes to the SEC itself—the very body which, before initiating an administrative proceeding, determined that an enforcement action was warranted—and the SEC is empowered to decline to hear the appeal or to impose even greater sanctions.  A final order of the Commission, after becoming effective, would then need to be appealed to a United States Court of Appeals under a deferential standard of review.

29

### *SEC ALJs Have Broad Discretion and Wield Significant Power*

60.    SEC ALJs, who preside over administrative proceedings, exercise significant authority and broad discretion that makes them "officers" for the purposes of Article II of the Constitution.

61.    Under the SEC Rules of Practice, an SEC ALJ—expressly referred to in the Rules of Practice as the "hearing officer"—is empowered, within his or her discretion, to perform the following, among other things:

    a.    Take testimony.  RoP 111.

    b.    Conduct trials.  RoP 111.

    c.    Rule on admissibility of evidence.  RoP 320.

    d.    Order production of evidence.  RoP 230(a)(2), 232.

    e.    Issue orders, including show-cause orders.  *See, e.g.*, 17 CFR 201.141(b).

    f.    Rule on requests and motions, including pre-trial motions for summary disposition.  *See, e.g.*, RoP 250(b).

    g.    Grant extensions of time.  RoP 161.

    h.    Dismiss for failure to meet deadlines.  RoP 155(a).

    i.    Reconsider their own or other SEC ALJs' decisions.  RoP 111(h).

j.      Reopen any hearing prior to the filing of a decision.  RoP 111(j).

k.      Amend the SEC's OIP.  RoP 200(d)(2).

l.      Impose sanctions on parties for contemptuous conduct.  RoP 180(a).

m.      Reject filings that do not comply with the SEC's Rules of Practice.  RoP 180(b).

n.      Dismiss the case, decide a particular matter against a party, or prohibit introduction of evidence when a person fails to make a required filing or cure a deficient filing.  RoP 180(c).

o.      Enter orders of default, and rule on motions to set aside default.  RoP 155.

p.      Grant law enforcement agencies of the federal and state government leave to participate.  RoP 210(c)(3).

q.      Require amended answers to amended OIPs.  RoP 220(b).

r.      Direct that answers to OIPs need not specifically admit or deny, or claim insufficient information to respond to, each allegation in the OIP.  RoP 220(c).

s.      Grant or deny leave to amend an answer.  RoP 220(e).

t.      Direct the parties to meet for prehearing conferences, and preside over such conferences as the ALJ "deems appropriate." RoP 221(b).

u.      Order any party to furnish prehearing submissions. RoP 222(a).

v.      Issue subpoenas. RoP 232.

w.      Rule on applications to quash or modify subpoenas. RoP 232(e).

x.      Order depositions, and act as the "deposition officer." RoP 233, 234.

y.      Regulate the SEC's use of investigatory subpoenas after the institution of proceedings. RoP 230(g).

z.      Modify the Rules of Practice with regard to the SEC's document production obligations. RoP 230(a)(1).

aa.     Order that hearings be stayed while a motion is pending. RoP 154(a).

bb.     Stay proceedings pending Commission consideration of offers of settlement. RoP 161(c)(2).

cc.     Modify the Rules of Practice as to participation of parties and amici. RoP 210(f).

32

dd.    Allow the use of prior sworn statements for any reason, and limit or expand the parties' intended use of the same.  RoP 235(a), (a)(5).

ee.    Express views on offers of settlement.  RoP 240(c)(2).

ff.    Grant or deny leave to move for summary disposition.  RoP 250(a).

gg.    Order that hearings not be recorded or transcribed.  RoP 302(c).

hh.    Issue protective orders governing confidentiality of documents.  RoP 322.

ii.    Take "official notice" of facts not appearing in the record. RoP 323.

jj.    Regulate the scope of cross-examination.  RoP 326.

kk.    Certify issues for interlocutory review, and determine whether proceedings should be stayed during pendency of review. RoP 400(c), (d).

62.    At the close of an administrative proceeding, the SEC ALJ issues his or her decision, referred to in the Rules of Practice as the "initial decision." RoP 360.  The initial decision states the time period within which a petition for

33

Commission review of the initial decision may be filed.  The SEC ALJ exercises his or her discretion to decide that time period.

63.     The initial decision becomes the final decision of the SEC after the period to petition for review expires, unless the Commission takes the SEC ALJ's decision up for review.  With certain exceptions that do not apply to this matter, the Commission is not required to take up any SEC ALJ's decision for review.

64.     If no party requests review, and if the Commission does not undertake review on its own initiative, no Commission review occurs.  Instead, the Commission simply enters an order that the decision has become final, and "the action of [the] administrative law judge . . . shall, for all purposes, including appeal or review thereof, be deemed the action of the Commission." 15 U.S.C. § 78d-1(c).  The order of finality states the date on which sanctions imposed by the SEC ALJ, if any, will become effective.  RoP 360(d)(2).

65.     Nothing in the rules or statutes prevents the Commission from making the ALJ's sanction effective before the respondent has had an opportunity to appeal the Commission's order, and in fact, the Commission routinely makes sanctions effective immediately.  *See, e.g.*, *In the Matter of Mark Andrew Singer*, Exchange Act Rel. No. 3910, Rel. No. 72996, 2014 WL 4370854 (ALJ Sept. 4, 2014).

## THE ADMINISTRATIVE PROCEEDING VIOLATES THE
## APPOINTMENTS CLAUSE IN ARTICLE II OF
## THE UNITED STATES CONSTITUTION

66.     Article II, Section 2 of the United States Constitution states that only the following have authority to appoint "inferior Officers," such as ALJs: the President, the courts of law, or the "Heads of Departments."  Art. II, § 2, cl. 2.

67.     The SEC is a "Department" under Article II, and its Commissioners are the Department "heads."  *Free Enterprise*, 561 U.S. at 511-13.

68.     Despite their crucial role within the Department and extensive powers as inferior officers, the SEC ALJs are not appointed by the President, the Courts, or the Commissioners.  Instead, they are hired by the SEC's Office of Administrative Law Judges, with input from the Chief Administrative Law Judge, human resource functions, and the Office of Personnel Management.  In some cases, other federal agencies have simply transferred ALJs to the SEC. The Commissioners themselves are not involved in appointing ALJs. Thus, the appointment of ALJs, like the one presiding over Plaintiffs' administrative proceeding, is unconstitutional.

69.     The SEC has recently admitted that some ALJs were not appointed by the Commissioners.  *See In the Matter of Timbervest, LLC, et al.*, SEC

Administrative Proceeding File No. 3-15519 (Notice of Filing dated June 4, 2015) (Event 139).  In fact, the SEC admits that the ALJ presiding over Plaintiffs' case was not appointed by the SEC Commissioners and that the ALJ's appointment was likely unconstitutional if the ALJ was an "inferior Officer" for purposes of Article II, Section 2.  *See* Transcript of Record at 25-26, *Tilton v. SEC*, Case No. 15-cv-2472 (RA) (SDNY May 11, 2015), ECF No. 16 ("we acknowledge that the commissioners were not the ones who appointed, in this case, ALJ Foel[a]k").

70.    Because the ALJ presiding over Plaintiffs' administrative proceeding was appointed in violation of Article II, the proceeding is unconstitutional.

## THE SEC ALJs' REMOVAL SCHEME VIOLATES ARTICLE II's VESTING OF EXECUTIVE POWER IN THE PRESIDENT

71.    Article II of the Constitution vests executive power in the President, who must "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 1, cl. 1; *id.* § 3.  In discharging this duty, the Constitution authorizes the President to rely on the assistance of executive officers.  *Free Enterprise*, 561 U.S. at 483.

72.    Article II's vesting authority requires that the principal and inferior officers of the Executive Branch be answerable to the President and not be separated from the President by attenuated chains of democratic accountability.

36

Specifically, as the Supreme Court held in *Free Enterprise*, Article II requires that executive officers, who exercise significant executive power, not be protected from removal by their superiors at will, when those superiors are themselves protected from removal by the President at will. *Id.* at 483-84.

73.     As executive officers, SEC ALJs may not be protected by more than one layer of tenure protection.

74.     SEC ALJs are removable from their position by the SEC "only" for "good cause," which must be "established and determined" by the Merits Systems Protection Board ("MSPB"). 5 U.S.C. § 7521(a).

75.     This removal procedure involves two or more levels of tenure protection.

a.     First, SEC ALJs are protected by statute from removal absent "good cause." 5 U.S.C. § 7521(a).

b.     Second, the SEC Commissioners, who exercise the power of removal, are themselves protected by tenure. They may not be removed by the President from their position except for "inefficiency, neglect of duty, or malfeasance in office." *See, e.g.*, *Free Enterprise*, 561 U.S. at 487 (citation omitted); *MFS Sec. Corp. v. SEC*, 380 F.3d 611, 619-20 (2d Cir. 2004) (citation omitted).

c.    Third, members of the MSPB, who determine whether sufficient

"good cause" exists to remove an SEC ALJ, are also protected by

tenure.  They too are removable by the President "only for

inefficiency, neglect of duty, or malfeasance in office."  5 U.S.C. §

1202(d).

76.    This multi-layer good-cause tenure protection is analogous to the

tenure structure that was held to violate Article II in *Free Enterprise*.  Indeed,

like its counterpart in *Free Enterprise*, this removal scheme impairs the

President's ability to ensure that the laws are faithfully executed.  *Free

Enterprise*, 561 U.S. at 498.

77.    Because the President cannot oversee SEC ALJs in accordance

with Article II, SEC administrative proceedings violate the Constitution.

## THE ADMINISTRATIVE PROCEEDING VIOLATES DUE PROCESS

78.  The due process clause of the Fifth Amendment provides that "[n]o

person  . . . shall be deprived of life, liberty, or property, without due process of

law."  U.S. Const. amend. V.  "Since the Fifth Amendment's ratification, one

theme above all others has dominated the Supreme Court's interpretation of the

Due Process Clause:  fairness."  *Ass'n of Am. Railroads*, 821 F.3d at 27.

79.    The SEC administrative proceeding seeks to deprive Plaintiffs of

liberty, property, and perhaps even their livelihood, in a fundamentally unfair

38

proceeding.  Indeed, the SEC's administrative proceedings lack significant

procedural protections to such a degree that they violate the Constitution's due

process clause.

80.    Before the enactment of the Dodd-Frank Act in 2010, SEC

enforcement actions against unregulated individuals for civil penalties had to be

brought exclusively in an Article III court.[6]  By virtue of the Dodd-Frank Act,

however, the Commission now also possesses the authority and unfettered

discretion to bring this action against those who are not even registered with the

Commission in an administrative proceeding that lacks the same procedural

safeguards—including the Seventh Amendment right to a jury trial in a civil

case, the Sixth Amendment right to confront witnesses in a criminal case, and

those embodied in the Federal Rules of Civil Procedure and the Federal Rules

of Evidence—that are found in federal courts.  *See* Pub. L. No. 111-203,

§§ 929P(a)(1), (a)(2)(E), (a)(3)(e), and (a)(4)(e) (allowing the Commission to

seek civil penalties against "any person" in an administrative cease-and-desist

proceeding initiated under the Securities Act, the Exchange Act, the Company

Act, and the Investment Advisors Act).

---

[6] *See* Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub L. No. 101-429 (1990) §§ 101, 201, 302, 402 (authorizing the Commission to bring suit against "any person" in a federal district court to seek civil penalties); *see also* 15 U.S.C. § 78u-1 (authorizing the Commission to bring an action in federal district court to seek civil penalties for insider trading).

81.     In fact, the legislative history regarding Section 929P(a) of Dodd-Frank confirms that it was Congress' intent to make the remedies available in an administrative proceeding coextensive with those available in a federal action:

> This section streamlines the SEC's existing enforcement authorities by permitting the SEC to seek civil money penalties in cease-and-desist proceedings under Federal securities laws. The section provides appropriate due process protections by making the SEC's authority in administrative penalty proceedings coextensive with its authority to seek penalties in Federal court. As is the case when a Federal district court imposes a civil penalty in a SEC action, administrative civil money penalties would be subject to review by a Federal appeals court.

H.R. Rep. No. 111-687, § 211, at 78 (2010) (report on H.R. 3817, Investor Protection Act of 2009).

82.     Despite the broad scope of power delegated to the Commission, the Dodd-Frank Act lacks any "intelligible principle" as to when an enforcement action for civil penalties against an unregulated individual should be brought in an administrative, rather than a judicial, forum. *See* Pub. L. No. 111-203 §§ 929P(a)(1), (a)(2)(E), (a)(3)(e), and (a)(4)(e). The relevant legislative history is also silent on this matter. *See* H.R. Rep. No. 111-517, at 870-71 (2010) (Conf. Rep. on H.R. 4173, Dodd-Frank Wall Street Reform and Consumer Protection Act); H.R. Rep. No. 111-687, at 78 (2010).

83.     The result is to give the SEC unguided discretion to (1) deny respondents their constitutional right to a jury trial; and (2) subject them to a proceeding lacking the procedural safeguards built into federal court proceedings.  And, contrary to the legislative history, the right to appeal does not cure the due process issue, as federal appellate courts afford deference to the underlying (unfair) proceeding under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984).  Where the purpose of a statutory scheme or government practice is "to discourage the assertion of constitutional rights," like the Seventh Amendment right to a jury trial, "it is patently unconstitutional."  *Chaffin v. Stynchcombe*, 412 U.S. 17, 32 n.20 (1973) (citation and internal quotations omitted).  Dodd-Frank allows the SEC unfettered discretion to deny respondents the right to a jury trial, as well as the due process protections built into the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

84.     Moreover, because the remedies that the SEC may obtain in either district court or in an administrative proceeding are now the same, the principal objective consideration for the government in exercising its discretion over where to bring the case is whether it would be advantageous to the government to have a jury decide the charges.  In some cases, the government can and will conclude that the defendant would be unsympathetic to a jury.  In those cases

41

the government will bring the case in federal court.  In other instances, such as in this case, the government may conclude that its evidence would be insufficient to meet the prima facie elements of the charges before a jury and a federal judge applying the Federal Rules of Evidence.  In those cases, the SEC is likely to determine that the defendant should be stripped of the right to a jury and forced to proceed in the SEC's own administrative court.

85.    As explained above, the SEC enjoys a pronounced home-court advantage in its own administrative proceedings.  Allowing the SEC unilateral discretion in deciding which forum to bring its action thus raises the perverse incentive to initiate weak cases that would otherwise never be brought in federal court because the in-house administrative proceeding improperly tilts the odds in favor of the SEC.

86.    This advantage also extends to appeals of ALJ decisions, which are heard by the SEC's Commissioners, the very same Commissioners who authorized the action in the first instance.  According to a recent Wall Street Journal analysis, from January 2010 through March 2015, the Commissioners found for the SEC in 53 out of 56 appeals (or 95% of the time).  *See* Jean Eaglesham, *SEC Wins With In-House Judges*, (http://www.wsj.com/articles/sec-wins-with-in-house-judges-1430965803), Wall St. J., (May 6, 2015), n.7.  This

rate of success by the SEC raises serious doubt as to whether the appeals process is genuinely meaningful.

87.    Indeed, this high success rate comes as no surprise.  As described above, the SEC administrative proceeding lacks the constitutional and procedural safeguards available in a federal district court action and is unfairly stacked in favor of the SEC.

88.    Administrative proceedings run on a much faster timetable than civil cases in federal court.  Under Rule of Practice 360, an evidentiary hearing must occur, at most, approximately four months after the SEC issues an OIP. The SEC even has the discretion to require that the hearing occur as early as one month after the OIP's issuance.  And the SEC need not begin making available the limited discovery afforded to respondents in an administrative proceeding until seven days after the OIP's issuance.  In essence, while the SEC enjoyed the advantage of having more than one year to conduct its investigation of this complex case, Mr. Dersovitz and RDLC are required to digest the millions of pages in the investigative file and prepare for trial in, at most, a mere four months.

89.    Partially in response to the chorus of criticism of its administrative proceedings, the SEC recently promulgated new rules to make the proceedings at least appear more fair.  The new rules go into effect at the end of September.

90.   Appearances aside, however, the new rules do not remedy the basic unfairness of the administrative process.  In fact, several of the new rules offend traditional notions of a fair proceeding:

- The new rules reinforce and codify the practice of trial by hearsay, which is contrary to fundamental notions of due process. Specifically, the rules allow for introduction into evidence of sworn statements taken *ex part*e during the SEC's investigative process—such as investigatory testimony and declarations—in lieu of live testimony and without the protections of cross-examination.  RoP 235.

- The new rules require that within 20 days of being served with an OIP, respondents file an answer, and, unlike in federal court, risk waiving the right to challenge the SEC's ability to prove elements of their claim.  RoP 220.  Specifically, the amended rule requires that a respondent affirmatively state in an answer whether the respondent is asserting any avoidance or affirmative defenses, including but not limited to *res judicata*, the statute of limitations, or reliance even if such theories are "not technically considered affirmative defenses." Thus, a respondent must state in the answer "whether the respondent relied on the advice of counsel, accountants, auditors, or other

44

professionals, in connection with any claim, violation alleged, or

remedy sought."  Failure to make these statements constitutes waiver.

91.     That the administrative process stacks the deck against respondents

has been verified by someone who was uniquely qualified to render such an

assessment.  Lillian McEwen, *a former SEC ALJ*, recently told the Wall Street

Journal that she believed the administrative review process was at times slanted

against respondents.  *See* Jean Eaglesham, *SEC Wins With In-House Judges*,

The Wall Street Journal, May 6, 2015.  She stated that she retired because her

"loyalty to the SEC" was questioned by the agency's Chief Administrative Law

Judge after finding in favor of respondents in too many cases.  *Id*.  Ms.

McEwen also added that the expectation was for SEC judges to work under the

assumption that "the burden was on the people who were accused to show that

they didn't do what the agency said they did."  *Id*.

92.     More recently, a current Commissioner acknowledged that the

SEC's "enforcement program could also benefit from a look through the lens of

fairness."  Commissioner Michael S. Piwowar, *A Fair, Orderly and Efficient*

*SEC*, Remarks at "SEC Speaks" Conference, Feb. 20, 2015.  Indeed, to "avoid

the perception that the Commission is taking its tougher cases to its in-house

judges, and to ensure that all are treated fairly and equally," the Commissioner

called for the SEC to establish guidelines to determine which enforcement

actions should be brought in an administrative forum and which actions should be brought in federal court.  *Id.*  Yet, instead of providing the "consistent set of guidelines" advocated by this Commissioner, the recently published "Approach to Forum Selection in Contested Actions" from the SEC's Division of Enforcement[7] "shed[s] little light on how the decision will be made."  Peter Henning, *Choosing the Battlefield in S.E.C. Cases*, New York Times, May 11, 2015.

93.    One consideration contained in the Division of Enforcement's guidance suggests that the SEC desires to exert more control over the development of complex legal questions.  Indeed, when a case is "likely to raise unsettled and complex" issues, the guidance states that "consideration should be given to . . . obtaining a Commission decision on such issues, subject to appellate review in the federal courts [to] facilitate development of the law."[8] Before this guidance was issued, a former SEC Commissioner told the Wall Street Journal that in "bringing more cases in its own backyard, the agency is not only increasing its chances of winning but giving itself greater control over the future evolution of legal doctrine."  Jean Eaglesham, *SEC Wins With In-House Judges*, The Wall Street Journal, May 6, 2015.  And the SEC's efforts to

---

[7] SEC, "Approach to Forum Selection in Contested Actions."

[8] *See* SEC, Div. of Enforcement, "Approach to Forum Selection in Contested Actions" at 3.

shape the law are helped by the limited appellate review of Commission

interpretations of ambiguous securities law issues, which are entitled to

deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,*

*Inc.*, 467 U.S. 837, 842-45 (1984).  The SEC, however, has myriad ways to

develop legal doctrine without jettisoning the basic rights of litigants to a fair

and objective trial.

94.   Addressing the SEC's pursuit of remedies in administrative

proceedings, one federal judge recently remarked that "[o]ne might wonder:

from where does the constitutional warrant for such unchecked and unbalanced

administrative power derive?"  *S.E.C. v. Citigroup Global Markets Inc.*, 34 F.

Supp. 3d 379, 381 n.8 (S.D.N.Y. 2014) (Rakoff, J.)

## THE SEC's CHOSEN COURSE WILL CAUSE PLAINTIFFS SEVERE AND IRREPARABLE HARM

95.   Absent this Court's intervention, Mr. Dersovitz and RDLC will be

further subjected to the very proceeding that they claim is unconstitutional.  The

lack of traditional procedural safeguards in the administrative proceeding only

exacerbates that harm.

96.   If Mr. Dersovitz and RDLC fail to prevail in the administrative

proceeding, the damage could be severe and irreversible.  By the time they can

seek review of a final adverse Commission decision in a Court of Appeals, it

will be too late to unwind the substantial expense, burden, and reputational

harm that they will have already suffered in being compelled to participate in the unconstitutional administrative proceeding.  Any sanctions imposed could also damage and prevent Mr. Dersovitz and RDLC from obtaining meaningful judicial review of their constitutional challenges.

97.     Mr. Dersovitz and RDLC's participation in this unconstitutional proceeding cannot be redressed through legal relief either because the Commission is shielded from a suit for money damages by sovereign immunity doctrines.  *Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. County*, 893 F. Supp. 301, 309 (D.N.J. 1995) ("Where the Eleventh Amendment bars recovery of monetary damages from state entities, legal remedies are inadequate and the plaintiff has shown the irreparable harm necessary for injunctive relief.").  Even assuming money damages were available, the reputational harm Mr. Dersovitz and RDLC would suffer if the SEC imposes administrative sanctions would likely be impossible to monetize.

98.     The threatened injury to Mr. Dersovitz and RDLC outweighs any harm the Commission may suffer as a result of the temporary halting of the civil penalty administrative enforcement proceeding.  The SEC has already spent more than a year investigating Mr. Dersovitz and RDLC for alleged securities violations.  Thus, the SEC cannot reasonably contend that it will be irreparably harmed by a pause in the administrative proceeding pending resolution of Mr.

48

Dersovitz and RDLC's constitutional claims.  Indeed, any harm befalling the SEC could be immediately remedied by the SEC through the commencement of a proceeding against Mr. Dersovitz and RDLC in federal court.

## COUNT ONE
## APPLICATION FOR INJUNCTIVE RELIEF

99.    Plaintiffs re-allege and incorporate paragraphs 1- 98 above, as if fully set forth herein.

100.   Plaintiffs' constitutional rights will be irreparably harmed if a permanent injunction (and, if necessary, a preliminary injunction and temporary restraining order) is not issued against the SEC's administrative proceeding. Plaintiffs have a substantial likelihood of success on the merits of his claim. Plaintiffs will be irreparably injured without injunctive relief, as described above, and the harm to them, absent injunctive relief, far outweighs any harm to the SEC should the requested relief be granted.  Finally, issuing an injunction will serve the public interest in ensuring that administrative enforcement schemes operate within constitutional boundaries.

## COUNT TWO
## DECLARATORY JUDGMENT

101.   Plaintiffs re-allege and incorporate paragraphs 1-98 above, as if fully set forth herein.

102.   Plaintiffs respectfully requests a declaratory judgment that:  (i) the appointments of SEC ALJs, including the ALJ presiding over Plaintiffs' administrative proceeding, are unconstitutional; (ii) the statutory and regulatory provisions providing for the position and tenure protections of SEC ALJs are unconstitutional; and (iii) the statutory and regulatory provisions governing the SEC's administrative civil penalty enforcement actions against unregulated individuals are unconstitutional

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray for the following relief:

(a)     An order and judgment declaring unconstitutional the statutory and regulatory provisions and practices for the appointment of SEC ALJs;

(b)     An order and judgment declaring unconstitutional the statutory and regulatory provisions providing for the position and tenure protection of the SEC ALJ;

(c)     An order and judgment declaring unconstitutional the statutory and regulatory provisions authorizing and governing the SEC's administrative civil penalty enforcement actions against unregulated individuals;

(d)     An order and judgment enjoining the Commission from pursuing an administrative proceeding against RDLC and Mr. Dersovitz;

(e)     An order enjoining the Commission from destroying, and requiring the Commission to preserve, all documents and communications relating to its action against Plaintiffs; and

(f)     Such other and further relief as this Court may deem just and proper, including reasonable attorney's fees and the costs of this action.

Respectfully submitted,

Hughes Hubbard & Reed LLP

By: s/ Wilfred P. Coronato

Wilfred P. Coronato
HUGHES HUBBARD & REED LLP
A New York Limited Liability Partnership
101 Hudson Street, Suite 3601
Jersey City, New Jersey 07302-3910
*Attorneys for RD Legal Capital, LLC and Roni Dersovitz*

Roel C. Campos
Terence M. Healy
(*pro hac vice* motion to be filed)
HUGHES HUBBARD & REED LLP
A New York Limited Liability Partnership
1775 I Street, N.W.
Washington, D.C. 20006-2401
Ph: (202) 721-4600
*Attorneys for RD Legal Capital, LLC and Roni Dersovitz*

David K. Willingham
Michael D. Roth
(*pro hac vice* motion to be filed)
CALDWELL LESLIE & PROCTOR, PC
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Ph: (213) 629-9040
*Attorneys for Roni Dersovitz*

Dated: August 22, 2016

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I, Wilfred P. Coronato, the undersigned attorney of record for Plaintiffs,

do hereby certify that the matter in controversy is the subject of an SEC

Administrative Proceeding, File No. 3-17342, instituted on July 14, 2016.

         s/ Wilfred P. Coronato
         _____